UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PROFESSIONAL HOUSE CLEANING BY MARY
G, LLC, an Oregon limited liability corporation,

                    Plaintiff,                                              Case No. 3:24-cv-00555-YY

          v.                                                               FINDINGS AND
                                                                           RECOMMENDATIONS
SONIA MEDINA LOPEZ, an individual,

                    Defendant.

YOU, Magistrate Judge.

## FINDINGS

This suit involves a dispute over the sale of a Washington-based residential cleaning

business originally owned and operated by Sonia Medina Lopez, the defendant in this case.

Maria Guzman, who owns Professional House Cleaning by Mary G, LLC, the named plaintiff,[1]

began working for defendant as a house cleaner in approximately 2021. At some point in 2023,

defendant told plaintiff that, because of her health and other problems, she was considering

selling the business, which essentially consisted of a client list and some cleaning supplies.

Eventually, the two agreed that plaintiff would buy the business for $30,000. Plaintiff took over

---

[1] For simplicity, Guzman and Professional House Cleaning by Mary G, LLC, are referred to
collectively as "plaintiff."

1 – FINDINGS AND RECOMMENDATIONS

the business around June of 2023 and paid the purchase price over several months. Shortly thereafter, plaintiff came to believe that defendant was attempting to undermine her success by allegedly "disparaging [plaintiff] and her cleaning business to one or more clients on the customer list," causing her business to "suffer a loss of business and income." Mot. Enforce/Mot. Summ. J. 4, ECF 26.

The two had an in-person meeting at defendant's house on February 12, 2024, to discuss the situation. There is no dispute that at some point, defendant offered to essentially "unwind" the transaction and give plaintiff the money back in exchange for return of the business. *Id*. 4–5. The parties dispute, however, whether plaintiff rejected that offer and instead asked defendant to sign a written "Sales Agreement," which purported to memorialize the original verbal agreement regarding the sale, or whether defendant left the offer open for plaintiff to discuss with her husband how she wanted to proceed. *See* Opp. 8–9, ECF 31. Plaintiff then texted defendant the next morning and indicated that she wanted to unwind the original transaction, but defendant did not respond. *Id.* at 9–11.

Sometime around that February 12, 2024 meeting, plaintiff told her daughter to ask the lawyer whom she worked for about the dispute, and he agreed to take the case. Plaintiff's counsel drafted a demand letter to defendant, who at all relevant times was unrepresented and, like plaintiff, does not speak English. The letter gave defendant the choice to "do this either . . . the easy way, or the hard way."[2] The "easy way" was for defendant to repay plaintiff the $30,000 and then "compete" with plaintiff for the clients that defendant had originally cultivated, or be sued in federal court. Plaintiff's counsel also wrote that he believed defendant had "committed

---

[2] Klingbeil Decl., Ex. 8 at 1, ECF 27. The demand letter was accompanied with a version translated to Spanish. *Id*. at 3–4.

fraud" and he would seek "punitive damages" against her for an additional $225,000 if she refused the settlement demands. Around that same time, there was a phone call between plaintiff's counsel and defendant, during which plaintiff's counsel used plaintiff's daughter as an interpreter, and during which defendant purportedly agreed to, among other things, pay plaintiff back by attempting to get a bank loan. Defendant testified, however, that she did so "out of fear" of plaintiff's attorney, and that he raised his voice and used other intimidating tactics in discussing the dispute with her. After that conversation, plaintiff's counsel sent defendant a proposed Agreement to Unwind the original transaction that contained several terms to which defendant says she never agreed, including that plaintiff would actually retain the client list and thus the transaction would not actually be unwound and the parties would not be in the same position that they would have been had the original transaction never occurred. Defendant refused to sign and hired a lawyer.

Plaintiff thereafter brought this suit in April 2024 alleging the following claims: (1) enforcement of settlement agreement/specific performance; (2) breach of contract; (3) fraud/misrepresentation; (4) tortious interference with business relations; (5) violation of non-complete agreement; and (6) breach of covenant of good faith and fair dealing. Compl. ECF 1. Plaintiff also seeks punitive damages. *Id.*

Currently pending is plaintiff's "Motion to Enforce Settlement Agreement and Motion for Summary Judgment on Claim for Enforcement of Settlement Agreement/Specific Performance," ECF 26. Plaintiff asserts that the essential terms of the settlement agreement arose during the in-person meeting between plaintiff and defendant in mid-February of 2024, were finalized during the call between plaintiff's lawyer and defendant later that month, and reduced to writing in the draft Agreement to Unwind. *Id.* at 1–2. As explained more fully below,

plaintiff's motion for summary judgment fails because there are numerous questions of fact

regarding whether a contract was ever formed between the parties. Furthermore, even assuming

that there was some agreement, there are questions of fact regarding its enforceability,

specifically whether plaintiff's counsel improperly coerced defendant, who does not speak

English and was not represented by counsel during the relevant time, into coming to some

"understanding" about how the transaction would be undone on terms unfairly favorable to

plaintiff.

## I.    Legal Standards

"The interpretation of a settlement agreement is governed by principles of state contract

law."[3] *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (1993) (citing *Jeff D. v. Andrus*, 899 F.2d

753, 759 (9th Cir. 1990)). "Under Oregon law, whether a contract exists is a question of law." *In*

*re Marriage of Baldwin*, 215 Or. App. 203, 207 (2007).

To determine whether a contract exists and what its terms are, courts "examine the

parties' objective manifestations of intent" as shown by their communications and acts. *Ken*

*Hood Const. Co. v. Pac. Coast Const., Inc.*, 201 Or. App. 568, 578 (2005). For a contract to be

enforceable, the parties must have agreed to all its essential or material terms. *Glob. Exec. Mgmt.*

---

[3] In their briefing, the parties rely on *Callie v. Near*, 829 F.2d 888 (9th Cir. 1987), as providing the framework for resolving this motion. There, the Ninth Circuit explained that "a district court has the equitable power to enforce summarily an agreement to settle a case *pending* before it." *Id.* at 890 (emphasis added). Here, plaintiff does not seek to enforce a settlement agreement that the parties reached in this case pending before the court. Rather, plaintiff seeks specific performance of a settlement agreement that was purportedly reached before this case was filed. Thus, strictly speaking, *Callie* does not apply, although certain equitable principles discussed in that case, such as a party's right to an evidentiary hearing when seeking relief in the form of specific performance, are still in force here. *See Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989) ("The motion to enforce the settlement agreement essentially is an action to specifically enforce a contract. An action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court.") (simplified).

*Sols., Inc. v. Int'l Bus. Machines Corp.*, 260 F. Supp. 3d 1345, 1368 (D. Or. 2017); *see also Pacificorp v. Lakeview Power Co.*, 131 Or. App. 301, 307 (1994) (explaining that a "meeting of the parties' minds on the essential terms . . . , rather than all terms, is all that is required" to establish an enforceable contract under Oregon law). "A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Glob. Exec.*, 260 F. Supp. 3d at 1368; *see also Johnstone v. Zimmer*, 191 Or. App. 26, 34 (2003).

Generally, a contract may be oral or written. *Ponderosa Properties, LLC v. Emp. Dep't*, 262 Or. App. 419, 435 (2014). But even if the parties mutually assented to an unwritten agreement, the terms of that agreement must be sufficiently defined or certain to allow a court to determine what the parties intended. *Benedict v. Held*, No. 3:19-cv-01295-HZ, 2021 WL 2720443, at *3 (D. Or. Feb. 7, 2021) ("If the parties' communications and actions manifest assent to be bound by promises, they will form a contract unless the promises are so indefinite that a court cannot determine what the parties intended.") (simplified); *Brazil v. FedEx Ground Pkg. Sys., Inc.*, No. 3:03-cv-06287-TC, 2004 WL 2457776, at *3 (D. Or. Nov. 1, 2004) ("Finally, even assuming, *arguendo,* that an oral agreement [existed], the terms of any agreement between the parties were insufficiently certain for the agreement to be enforceable.").

The party seeking to enforce a contract bears the burden to prove the contract exists and that the parties agreed to all its material terms. *Glob. Exec.*, 260 F. Supp. 3d at 1367; *Povey v. Clow*, 146 Or. App. 760, 764 (1997) ("Plaintiffs had the burden to establish that the . . . contract was definite in all material respects, with nothing left for future negotiation.").

## II.    Discussion

The question posed by the currently pending motion for summary judgment is a simple one: whether plaintiff has established that there is no question of fact as to whether the parties entered into an enforceable agreement to settle the dispute that arose regarding defendant's sale of the cleaning business to plaintiff. It undisputed that plaintiff and defendant reached an informal, oral agreement sometime in early 2023 that plaintiff would purchase defendant's cleaning "route" for $30,000 and that defendant made some kind of representation about not soliciting her now-former clients.[4] The agreement was seemingly firm enough around March of 2023 that defendant provided notice to at least some of her clients that she was no longer the "owner of the residential cleaning business" and would "[not] continue to work cleaning."[5] Approximately 30 days later, defendant transferred the client list to plaintiff, and on June 10, 2023, plaintiff made an initial $15,000 payment to defendant from plaintiff's personal checking account.[6] Four subsequent installments completed the transaction; the final $3,000 payment on December 10, 2023, was made by check from "Mary G LLC."[7] As part of the transaction, defendant gave plaintiff a car that was used for the cleaning business.[8]

Sometime after plaintiff took over the route in June of 2023, one of defendant's former clients contacted defendant and expressed some dissatisfaction with the work that plaintiff had done. Defendant agreed to help "fix it," and although defendant testified that she did not charge anything for the work, the client "tipped" her $80 each of the two times defendant worked on the

---

[4] Klein  Decl., Ex. 1 (Guzman Dep.) 25, ECF 32-1; Klein Decl., Ex. 2 (Medina Lopez Dep.) 49, ECF 32-2.
[5] Medina Lopez Dep. 47, ECF 32-2. Note that the exhibit reflecting this message does not appear to have been made part of the record.
[6] Klingbeil Decl., Ex. 3 at 1, ECF 27.
[7] *Id.* at 2–5.
[8] Medina Lopez Dep. 45, ECF 32-2.

client's home.[9] Defendant met another former client, whom she "considered to be a friend," and who also expressed that she was not entirely happy with the work now that plaintiff was in charge.[10] Defendant again agreed to help "fix it" and did two cleanings, free of charge.[11]

Word somehow reached plaintiff, and she in turn "reached out" to defendant and visited defendant at her house on February 12, 2024.[12] Plaintiff was "angry" because she believed that defendant was "taking [clients] away from her."[13] Defendant offered to "give [the] money back" in exchange for "giv[ing] the clients back" to defendant.[14] Defendant says that plaintiff flatly rejected that offer several times, and instead had brought "documents" prepared by her attorney that would "take care of" the dispute and that she wanted defendant to sign.[15] As it turns out, plaintiff's daughter worked as a "bi-lingual contract paralegal and videographer" at plaintiff's counsel's firm. Mot. Enforce/Mot. Summ. J. 13, ECF 26. Plaintiff had apparently "talked to [her] daughter" and asked her to "talk to the attorney" about the roiling dispute between plaintiff and defendant, and plaintiff's counsel took the case on a pro bono basis.[16]

---

[9] *Id.* at 57–60.

[10] *Id.* at 61–63.

[11] *Id.*

[12] *Id.* at. 64.

[13] *Id.* at 65; Guzman Dep. 56–57, ECF 32-1;

[14] Medina Lopez Dep. 65, ECF 32-2.

[15] *Id.* at 65–66, ECF 32-2; *see also* Medina Lopez Decl. ¶ 11, ECF 33.

[16] Medina Lopez Dep. 77, ECF 32-1; Klingbeil Decl., Ex. 8 at 2, ECF 27 (Feb. 19, 2024 letter from plaintiff's counsel to defendant). It is not entirely clear from the record when plaintiff retained counsel to represent her. In the briefing, plaintiff's counsel asserts that it was not until sometime after the in-person meeting on February 12, 2024, that plaintiff became "frustrated" and sought his assistance, although the portion of plaintiff's deposition that is cited in support of that proposition is not at all clear regarding that specific timeline. Mot. Enforce/Mot. Summ. J. 7, ECF 26 (citing Guzman Dep. 61, ECF 27). Defendant's testimony that plaintiff brought the "documents," i.e. the proposed Sales Agreement, to the in-person meeting on February 12, 2024, is not directly contradicted by any evidence in the record, and the existence of the document supports an inference that plaintiff obtained some kind of legal counsel prior to that meeting. The proposed Sales Agreement was plainly prepared by someone with at least basic legal training,

---

7 – FINDINGS AND RECOMMENDATIONS

In any event, the "documents" that plaintiff had brought comprised a written contract titled "Asset Purchase and Sale Agreement" that appears to have been drafted by plaintiff's counsel to in some way memorialize the original transaction. Notably, the term "Purchase Price and Payment Terms" states that the "parties acknowledge and agree that [plaintiff] has paid the purchase price for the Cleaning Business," and it lists the dates and amounts of the payments totaling $30,000 that plaintiff had already made to defendant.[17] It also seems that one goal in attempting to get defendant to sign this post-transaction agreement was for defendant to agree to

given that it includes many common terms (several of which are explored in more detail below), such as an indemnification clause and a written covenant not to compete, that were drafted or modified in such a way to obviously favor plaintiff's interests if she were to keep the cleaning business. Plaintiff's briefing is notably coy as to when the proposed Sales Agreement was presented to defendant; plaintiff's counsel only writes that defendant "did not sign the draft written agreement *later provided* by [plaintiff's] attorney for her to review and edit only because it inaccurately included GMP and her husband," *id.* at 7 (emphasis added), but the motion does not otherwise mention the proposed Sales Agreement at all, much less make any attempt to explain what effect it has on plaintiff's position that there was some agreement to unwind the transaction. To muddy the waters even further, plaintiff's counsel had marked the proposed Sales Agreement as an exhibit in preparation for defendant's deposition on October 15, 2024, but the document was not produced to defense counsel until that morning. *See* Medina Lopez Dep. 66, ECF 32-2. It is not particularly surprising then, that when defense counsel conducted plaintiff's deposition approximately a week prior, on October 7, 2024, there was no line of questioning exploring whether plaintiff had brought the proposed Sales Agreement with her to the February 2024 in-person meeting and if so, what the document might suggest about plaintiff's state of mind at that time, or what the two of them discussed about the document during that meeting. If anything, plaintiff's counsel's representation that the proposed Sales Agreement was not provided until "later," i.e. after the February 12th meeting, arguably eviscerates the argument that the parties could have agreed to unwind the transaction after defendant's offer on February 12 to do so, given the proposed Sales Agreement is designed to ensure that plaintiff maintained control of the business and thus tends to show that there was no meeting of the minds as to unwinding the sale. Furthermore, the existence of the Sales Agreement itself is problematic because, among other things, it appears to be an attempt to bind an unrepresented party to additional terms for a deal that had already been completed without any new consideration. Although the evidence in the record does not conclusively establish that plaintiff's counsel drafted this document, the fact that he "provided" it to defendant despite this fundamental flaw is another data point (others are discussed below) on which a reasonable factfinder might rely to conclude that plaintiff's counsel's tactics in attempting to influence defendant to come to some agreement to "unwind" the deal were improperly coercive.

[17] Medina Lopez Decl., Ex. 1 at 14, ECF 33-1.

a written covenant not to compete.[18] The proposed Sales Agreement further contains several new terms, including one that purported to obligate defendant to indemnify plaintiff for any breach of the representations and warranties in the agreement for a period of two years after the agreement was signed, but limited plaintiff's obligation to indemnify defendant for any similar breach for only one year and only if defendant identified the problem in writing before the agreement was fully executed.[19]

More importantly in defendant's eyes at the time was that the proposed Sales Agreement was drafted as if she was agreeing to sell the assets of "GMP, LLC," which was not part of the original informal agreement she had reached with plaintiff regarding the sale of the cleaning business. As was revealed in defendant's deposition, GMP, LLC was a business entity separate from defendant's cleaning business that defendant had helped form in 2016 for her husband, who worked as a contractor performing light maintenance such as gutter and window cleaning, pressure washing, and small remodeling projects.[20] Defendant told plaintiff that "GMP [was] not included"[21] in the sale. Plaintiff responded that she did not know much about the documents' terms, only that her attorney had "sent them for [defendant] to sign."[22]

Defendant testified that plaintiff "didn't want [her] to give the money back [and] that [plaintiff] wanted to continue with the route, with the houses."[23] At some point during this meeting, defendant suggested that plaintiff "speak with [her] husband" about whether she wanted to give up the route in return for defendant giving back the money.[24] Defendant says that

---

[18] *Id.* at 16.
[19] *Id.* at 7 (defining "Closing Date" and providing specific terms for indemnification).
[20] Medina Lopez Dep. 10–11, ECF 32-2.
[21] *Id*. at 66.
[22] *Id*.
[23] *Id.* at 67.
[24] *Id.* at 65.

plaintiff rejected that option and, in part by insisting that defendant sign the Sales Agreement, indicated that she wanted to keep the route.[25] Plaintiff, though, says that the conversation essentially ended with defendant's proposal that plaintiff should "talk it over with [her] husband," and admits that at that point, there was no agreement to "unwind" or undo the original transaction.[26]

The next day, plaintiff sent defendant a text saying that she thought it was "better for [defendant] to keep the route" and that they should "speak later [to] find out what the terms will be for when you want me to give it to you."[27] Defendant did not respond "because the day before . . . [plaintiff] told me, with certainty, no, more than once."[28] She decided then to block plaintiff's number because she was dealing with an ongoing "problem of a family nature" and she "felt as though it required all of [her] attention rather than dealing someone who was saying yes and then no and then yes and then no."[29]

Shortly thereafter, defendant began receiving phone calls from plaintiff's counsel. And, although the precise sequence of events is not entirely clear, defendant at some point received a letter dated February 19, 2024, from plaintiff's counsel and there were at least two phone conversations between defendant and plaintiff's counsel regarding the dispute. First, as to the letter, plaintiff's counsel wrote as follows:

> I represent Maria de la Cruz Guzman Villalobos, Beyra Valeria Guzman, and Professional House Cleaning by Mary G, LLC.
>
> As a member of GMP, LLC, you entered into a sales Agreement with my clients. The details of that Agreement are discussed in the

---

[25] *Id.* at 65–67.
[26] Guzman Dep. 75, ECF 32-1.
[27] *See* Klingbeil Decl., Ex. 6, ECF 27 (original text message in Spanish); Medina Lopez Dep. 71, ECF 32-2 (at which translator for defendant's deposition translates the message in English into the record).
[28] Medina Lopez Dep. 67, ECF 32-2.
[29] *Id.* at 68.

attached federal lawsuit attached to this letter. This lawsuit has not yet been filed with the court.

In short, you have breached that Agreement in a manner that requires that you unwind the deal and reimburse my clients the $30,000 paid to you previously.

Beyond that, based on my investigation, your conduct has also been fraudulent, intentional, and in bad faith. This conduct subjects both GMP, LLC and you personally to substantial damages beyond the $30,000. If we are not able to unwind the failed agreement and if you fail to reimburse my clients the full amounts paid previously, I will file the attached lawsuit in the federal district court in Oregon and proceed with the claims.

As you can see, the lawsuit seeks at least $75,000 for the direct financial harm your conduct has caused my clients and their business to date. We are also seeking an additional $225,000 in punitive damages to account for the egregious and bad faith nature of your conduct discovered during my investigation into this matter.

We can do this either of two ways, it is your choice – the easy way, or the hard way.

The easy way: you immediately repay the $30,000 to my clients and the Agreement is invalidated. Because of the inconvenience, disruption, and stress your conduct has caused my clients and their business, they will keep the Toyota vehicle you provided previously. All parties are then free to compete against each other and seek any client or business as they please. In other words, the money is repaid, and both businesses go forward as if there was never an Agreement.

The hard way: if you do not agree to easy way discussed above, and I file the attached lawsuit. I am providing legal services to my clients at no cost, but your costs to defend this case will easily go far beyond the $30,000 reimbursement and replacement of the vehicle at issue. In addition to the costs of your legal representation, based on the evidence we have uncovered, a jury will look unfavorably on your conduct and likely award actual and punitive damages far beyond the $30,000 reimbursement.

Let me know your choice in writing by noon, Thursday, February 22, 2024. . . . If you choose the hard way to do this, or if I do not

> hear from you, I will file this claim on Friday and proceed with the
> lawsuit.[30]

Around that same time, plaintiff's counsel apparently called defendant with what defendant

understood was an ultimatum:

> I received a phone call stating that it was [plaintiff's counsel] that
> said, you have until tomorrow to refund the $30,000 that you owe
> to [plaintiff], otherwise I'm going to sue you in Oregon Federal
> Court.

Sometime after that initial phone call, there was at least one other particularly substantive

phone call during which defendant agreed to "take the list back and pay [plaintiff] the money

back."[31] There are a number of important details about this phone call, in particular plaintiff's

counsel's alleged conduct during the call, that will be discussed in more detail below; suffice it

to say that plaintiff's counsel seemed to believe that he had struck a deal to end the dispute, and

proceeded to draft a written contract purportedly memorializing the terms.

Plaintiff's counsel subsequently delivered to defendant a document entitled "Agreement

to Unwind Verbal Business Transaction Agreement," containing the following terms, in relevant

part:

- Defendant and plaintiff would "unwind and rescind" the original transaction; defendant would pay $5,000 at signing and the remaining $25,000 within 90 days;
- Plaintiff would "retain ownership of the customer list, interior house cleaning customer accounts, and the Toyota Corolla" that defendant had given to plaintiff as part of the original transaction;
- Plaintiff agreed to "forgo filing legal claims against [defendant]" that arose prior to the new agreement, but if defendant breached the agreement, plaintiff was "free to file any legal claims she may have had against [defendant] on the date this Agreement was signed, and without regard to and notwithstanding any statute of limitation or claim of untimeliness by [defendant]";

---

[30] Klingbeil Decl., Ex. 8 at 1–2, ECF 27.
[31] Medina Lopez Dep. 77, ECF 32-2.

- Both parties were "free to compete for each other's house cleaning customers and accounts," though the parties agreed to "refrain from disparaging the other party personally or disparaging the other's party's business in any manner[.]"[32]

Defendant did not sign the proposed Agreement to Unwind because "[n]one of it was favorable to [her], everything was favorable to the other side."[33] She thought, based on the phone conversation with plaintiff's counsel, that the "car was going to be returned" and that "the clients would be returned and [she] would return the money, but . . . it turned out that [plaintiff] wasn't planning to return" either one.[34]

When defendant refused to sign or return the $30,000 original payment, plaintiff filed this suit and, after depositions of both parties were conducted, plaintiff filed the currently pending motion for summary judgment. The motion asserts that the parties "first reached a verbal settlement of their dispute in early February [] 2024," but that defendant "then breached that agreement by cutting off all communications with [p]laintiff and failing to follow through on the agreement." Mot. Enforce/Mot. Summ. J. 1–2, ECF 26. Plaintiff further contends that defendant and plaintiff's counsel "worked out the final details of the settlement" but that defendant "refused to either perform on the verbal agreement or work to memorialize the agreement," the material terms of which included a refund of the $30,000 and the "right of [plaintiff] and [defendant] to both compete for the . . . customers[.]" *Id.* at 2.

Plaintiff's motion for summary judgment fails because there are questions of fact as to any agreement that plaintiff and defendant allegedly reached. First, there is a dispute about what happened at the in-person meeting on February 12, 2024. Defendant says that plaintiff rejected

---

[32] Medina Lopez Decl., Ex. 2 at 1, ECF 33-2.
[33] Medina Lopez Dep. 83, ECF 32-2.
[34] *Id.* at 83–84.

defendant's offer to "unwind" the transaction and return the money in exchange for the return of the client list and instead asked defendant to sign the proposed Sales Agreement. Plaintiff says, essentially, that defendant left the offer to "unwind" open and asked that plaintiff "talk it over with her husband." Whether plaintiff's text the following morning could be an effective acceptance of an offer depends on a disputed issue of fact as to whether the offer was still open at that time or had been rejected by plaintiff. Thus, there can be no summary enforcement of any settlement agreement based on the communications between plaintiff and defendant on February 12 and 13, 2024. *See* Mot. Enforce/Mot. Summ. J. 12, ECF 26 (asserting that "[u]pon [defendant's] receipt of [plaintiff's] text, the parties had agreed on the essential terms and had an enforceable settlement").

That leaves the purported oral agreement to settle the case, which plaintiff's counsel says occurred during a phone call between him and defendant sometime around the time that defendant received the February 19, 2024 demand letter. This "agreement" is not subject to summary enforcement for several reasons, but primarily because there is a question of fact as to whether it was coerced or otherwise improperly influenced by the conduct of plaintiff's counsel. *See* Opp. 15–17, ECF 31 (asserting that if there was an agreement, it was "the result of intimidation and forceful tactics of adverse counsel").

First, defendant was not represented by counsel at the relevant time, and she does not speak English. Not only that, but it is immediately apparent from the transcript and the other evidence in the record that, despite plaintiff having helped her husband set up a business entity and operating her own cleaning business, defendant is not legally sophisticated. Defendant

testified that she only completed education through the third grade and had difficulty

understanding the documents that plaintiff's counsel prepared and asked her to sign.[35]

       In addition to the stark imbalance of bargaining power, defendant testified that she felt

threatened by plaintiff's counsel's conduct. It appears that plaintiff's counsel called defendant,

perhaps as a follow-up to the February 19, 2024 demand letter:

> I received a phone call stating that it was [plaintiff's counsel] that
> said, you have until tomorrow to refund the $30,000 that you owe
> to my client, Mary de la Cruz Guzman, otherwise I'm going to sue
> you in Oregon Federal Court. At that point, it was as though my
> mind was going back to some years ago when the people who had
> kidnapped by brother were asking for the same amount of money,
> giving me a certain amount of time to pay, and that otherwise they
> would kill him. It was as though all of that was coming back to me.
> I started shaking, I called my husband. I explained it to him
> somewhat. I told him I don't want to be in Federal Court, I don't
> know what I did but I would rather give Mary her money back
> than go to Federal Court.
>
> . . .
>
> I don't wish any harm to anyone. If I made a mistake, I'm here to
> pay for that and to be judged by the judge in order to determine
> what I did wrong.[36]

Defendant explained, "I don't know whether it was threatening [or] intimidation . . . . Perhaps I

felt it to be that way, perhaps that was the intention . . . She wanted me to return the money to her

the following day, and otherwise I would be taken to Federal Court."[37] Defendant perceived

plaintiff's counsel's conduct as intimidating because he allegedly spoke "with anger and with

a[n] apparently threatening voice" during their phone conversations and at least at one point

---

[35] Medina Lopez Dep. 78, ECF 32-2.
[36] *Id.* at 79–80.
[37] *Id.* at 82.

purportedly "raise[d] [his] voice" at defendant when he told her that she "would be sued, that a lawsuit was going to filed against [her] in Federal Court in Oregon."[38]

The next day, "out of fear and so as not to go to Federal Court," defendant called plaintiff's counsel, and during that conversation, defendant offered to "pay the $5,000 quickly and then get a loan for the remainder of the money from the bank."[39] There was also some discussion about the car, and whether it would be returned to defendant, and whether she would agree to paying plaintiff an additional $500 for "improvements" for repairs that plaintiff had allegedly made to it.[40] At some point, plaintiff's counsel essentially turned the conversation over to plaintiff's daughter, who acted as a translator for the remainder of the call. Plaintiff's counsel muted his line or otherwise stepped back from the conversation such that defendant could not hear his voice and only heard plaintiff's daughter as she purportedly translated what plaintiff's counsel wanted defendant to hear.[41] Plaintiff's daughter said that "they[42] had investigated" and found that defendant "had committed fraud toward . . . [plaintiff]" and "had to return the money as soon as possible."[43] Not only does the daughter's involvement raise questions about the accuracy of the translation, given her arguable familial interest in seeing plaintiff prevail in the dispute, but there is also the arguable risk of coercion or intimidation where plaintiff's counsel used plaintiff's daughter to translate a legally significant conversation with an unrepresented defendant.

---

[38] *Id.* at 86–87.
[39] *Id.* at 77.
[40] *See id.* at 77–78.
[41] *Id.* at 100.
[42] The term "they" presumably meant plaintiff's counsel and plaintiff's daughter.
[43] *Id.*

The potentially coercive nature of the interactions between plaintiff's counsel and defendant is also evidenced by the terms plaintiff's counsel attempted to extract from defendant (who, again, was unrepresented) in the "negotiation." During the phone call with plaintiff's counsel, defendant apparently agreed to try and get a bank loan to pay plaintiff back, which suggests the existence of some temporal pressure, despite there being no evidence in the record that suggests any such expediency was necessary. The demand letter (and subsequent proposed Agreement to Unwind) that plaintiff's counsel prepared made clear that plaintiff would not only be repaid, but she would not return the client list to defendant; instead, plaintiff would "retain ownership of the customer list" and defendant was "free to compete" with plaintiff for the clients that defendant had originally cultivated.[44] Furthermore, plaintiff's counsel also included a term that sought to proactively waive defendant's right to assert a defense based on the statute of limitations in any subsequent lawsuit that plaintiff might bring regarding the original transaction or the Agreement to Unwind.[45]

The February 19, 2024 demand letter too had its share of language that could be interpreted as potentially coercive. Plaintiff's counsel wrote that plaintiff could "do this either . . . the easy way, or the hard way." The easy way was to pay plaintiff $30,000 and then "compete" with her for the clients. The hard way was to face a lawsuit from plaintiff in federal court for which, plaintiff's counsel mentioned, he was "providing legal services . . . at no cost" and for which defendant could "easily" pay more than $30,000 to defend. Not only that, but the inclusion of an allegation of punitive damages which, at least based on the evidence in the record at this

---

[44] Medina Lopez Decl., Ex. 2 at 1, ECF 33-2.
[45] *Id*.

point, does not appear to be well-supported by any reasonable interpretation of the facts, further supports an inference of possible intimidation or coercion.

Still other facts further suggest that any "agreement" defendant made with plaintiff's counsel could have been the result of some improper influence. Plaintiff's counsel called defendant repeatedly, so much, in fact, that she blocked his number at some point, indicating her intent to cut off communications about the dispute.[46] Defendant testified that "they" then used plaintiff's daughter's number to try and circumvent defendant's attempt to end the communications with plaintiff's counsel, but defendant refused to answer.[47] At one point during the phone conversation, plaintiff's counsel apparently represented to defendant through plaintiff's daughter as the interpreter that "he wanted to be fair toward both sides" and he "would look after [defendant] as he would look after [plaintiff]," and defendant contends that he never advised her to seek independent legal counsel.[48] Such conduct and representations call into question the extent to which defendant truly intended to reach some agreement to unwind the transaction.

The above exposition of the evidence in the record is not provided as a finding of fact, nor should it be interpreted as coming to any conclusion about what actually transpired between plaintiff and defendant, or defendant and plaintiff's counsel. That is not the task here. Rather, the question is whether plaintiff has carried the burden of showing that, based on the evidence presented, there is no disputed issue of fact as to whether the parties entered into an agreement. As explained above, there is a dispute about whether plaintiff rejected defendant's initial offer to unwind the sale and instead tried to get defendant to sign a written "Sales Agreement" that would

---

[46] Medina Lopez Dep. 81, 101, ECF 32-2.
[47] *Id.* at 81.
[48] *Id*. at 103–04, 123–24.

memorialize the sale. And there are several questions of fact regarding the circumstances

surrounding the interactions between plaintiff's counsel and defendant that call into question

whether there was a true "meeting of the minds" about the terms of the settlement. For those

reasons, plaintiff's motion for summary judgment necessarily fails.

## RECOMMENDATIONS

Plaintiff's Motion to Enforce Settlement Agreement and Motion for Summary Judgment

on Claim for Enforcement of Settlement Agreement/Specific Performance (ECF 26) should be

denied to the extent plaintiff seeks summary judgment because there are questions of fact as to

whether the parties ever came to a meeting of minds to settle the dispute about the sale of the

cleaning business and the terms that would control any potential "unwinding" of the deal.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if

any, are due Friday, January 16, 2026.  If no objections are filed, then the Findings and

Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to

the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal

Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED December 31, 2025.

/s/ Youlee Yim You
_____
Youlee Yim You
United States Magistrate Judge
